IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JUDY ANN BORTZ,**                                    Case 1:14 CV 513

    Plaintiff,                                        Judge Patricia A. Gaughan

    v.                                               Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                       REPORT AND RECOMENDATION

### INTRODUCTION

Plaintiff Judy Ann Bortz filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g). This matter has been referred to the undersigned for Report and Recommendation pursuant to Local Rule 72.2(b)(1). (Non-document entry dated March 6, 2014). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB on March 29, 2011, alleging a disability onset date of March 9, 2011. (Tr. 14). Plaintiff applied for benefits due to severe arthritis, back pain, depression, irregular bowel movements, and no use of her right hand. (Tr. 163). Her claim was denied initially (Tr. 95-98) and upon reconsideration (Tr. 102-08). Plaintiff requested a hearing before an administrative law judge ("ALJ") on January 28, 2012. (Tr. 109). Plaintiff, represented by counsel, and a vocational expert ("VE") testified at a hearing before the ALJ on September 14, 2012, after which the ALJ found Plaintiff not disabled. (Tr. 65, 84-126). The Appeals Council

denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 404.955, 404.981. Plaintiff filed the instant action on March 6, 2014. (Doc. 1).

**FACTUAL BACKGROUND**

### *Personal Background and Testimony*

Plaintiff was born on August 17, 1959, and was 52 years old at the time of application for DIB. (Tr. 65). Plaintiff lived with her husband and had completed the tenth grade. (Tr. 39, 41). Plaintiff had prior work as a receptionist, waitress, and order clerk. (Tr. 36, 40-41).

She described the right hand pain as extreme numbness, burning, and shooting pains that sometimes extended all the way to her elbow. (Tr. 45-46). Her hand pain persisted through the night and caused her to toss and turn. (Tr. 51). The pain in her right hand prevented her from typing, lifting, or writing anything other than her signature. (Tr. 45). She stated she could not open her right hand all the way and could not hold a phone or coffee cup for long periods. (Tr. 47-48). She had sharp pain, aching, and stiffness in her neck recently that reduced her lateral range of motion. (Tr. 48-49). Plaintiff also had aching, burning, and throbbing in her lower back that occurred when she had been sitting or standing for longer than a half hour. (Tr. 49). She testified her left knee and foot caused her pain upon motion but were fine when seated. (Tr. 49-50). Plaintiff reported decreased energy and daily crying spells that lasted about 20-30 minutes. (Tr. 50-51). She also stated she had very severe migraines up to four times a week. (Tr. 44). Plaintiff was prescribed Cymbalta, Vicodin, Lyrica, and Sumatriptan for her symptoms. (Tr. 42-43).

She testified the pain in her hand made it difficult to dress such that she avoided clothing with snaps or buttons. (Tr. 45). In terms of hygiene, Plaintiff stated she only washed her hair

once a week and did not brush it daily. (Tr. 45). Plaintiff testified she did not do any household chores, grocery shopping, or driving because of her pain. (Tr. 46-47). She claimed before the surgery, she used to cook and clean for her family. (Tr. 50). After the surgery, she made frozen meals and sandwiches and was only capable of light housework. (Tr. 176). Plaintiff stated she no longer socialized with friends because she was not comfortable but admitted she was comfortable among her family. (Tr. 50-51). She stated she never left the house alone unless it is to let the dog out. (Tr. 51). She listed her hobbies as reading, watching TV, and playing with her grandkids. (Tr. 178). Plaintiff also stated she could follow written and spoken directions, got along well with authority figures, and could handle changes in routine well but admitted she did not handle stress well. (Tr. 179-80).

***Relevant Medical Evidence***

In 2009 and 2010, Plaintiff treated with Charles LoPresti, M.D., for her arthritis. (Tr. 345-46). She noted increasing discomfort in her hands and wrists and had positive grind tests. (Tr. 345-46). However, he also reported negative Tinel and Phalen tests, no obvious swelling, and normal sensation. (Tr. 346). In May 2010, it was reported Plaintiff had negative Finkelstein bilaterally and no trigger thumb bilaterally. (Tr. 347). Plaintiff was treated with Kenalog and Lidocaine injections. (Tr. 345-47).

In January 2011, Plaintiff saw Alan Panteck, M.D., for bilateral first carpometacarpal arthritis where she reported significant pain in her right hand and increasing pain in her left. (Tr. 344). At this time, Plaintiff opted for surgical intervention on her right hand. (Tr. 344). On March 10, 2011, Dr. Panteck performed a right carpometacarpal anthroplasty with ligament reconstruction to improve arthritis pain in Plaintiff's first right joint. (Tr. 315-16).

About a month later, Plaintiff began occupational therapy to decrease right thumb pain and hypersensitivity and increase thumb usage for work and home tasks. (Tr. 324). At her first appointment she complained of burning pain, cried the whole time, and had to take medication for the pain. (Tr. 325). Over the course of her next appointments, Plaintiff continued to complain of significant nerve pain and hypersensitivity but did continue to report improvement. (Tr. 329, 332, 334, 429, 434, 435). Plaintiff was also encouraged to decrease the guarding of her hand and begin using it for light functions, such as typing or brushing her teeth, she did not do so. (Tr. 430, 432). Plaintiff was discharged after nine appointments due to her lack of follow-up. (Tr. 427).

In follow-ups in March, April, and May 2011 with Dr. Panteck, Plaintiff reported that while she still had significant burning pain, it was slowly improving. (Tr. 341, 342, 343). On physical examination, he reported hypersensitivity to touch, tenderness when palpating, but reported the x-rays showed good space from the excised trapezium. (Tr. 341, 342). In June 2011, Plaintiff's pain was localized to the superficial radial nerve but an electromyography was negative for radial nerve entrapment. (Tr. 363, 373-74).

In May 2011, Plaintiff began seeing Mary Gorjanc, M.D., for her right wrist pain, right neck and shoulder pain, low back pain, migraines, and depression. (Tr. 516). In follow-up appointments, Plaintiff continued to complain of the same burning pain and that the injections given by Dr. Salama were not working but that the occupational therapy was "helping her quite a bit." (Tr. 521, 522, 524, 528). Plaintiff did note that Cymbalta was helping her depression however she did not follow up with a psychiatrist as recommended. (Tr. 533).

On June 27, 2011, Plaintiff was seen for pain management by Sherif Salama, M.D. (Tr. 407). He observed severely decreased range of motion in her right wrist, decreased right hand grip, and tenderness in the right hand but her left wrist and hand showed no distress. (Tr. 409). In

July 2011, Dr. Salama administered a sympathetic nerve block of the right stellate ganglion to reduce Plaintiff's pain. (Tr. 419). In follow-up appointments, Dr. Salama observed no tenderness in the left hand or wrist, normal range of motion and motor strength in the both hands, normal Jamar Grasp, Pinch Grip Jaw Chuck, Pinch Grip Key and Pinch Grip Tip in both hands, and no spascity or atrophy in either hand. (Tr. 402, 405, 408, 409). In October 2011, Dr. Salama administered a median branch nerve block to the right C5-C6, right C6-C7, and right C7-T1 vertebrae to absolve radiating pain from Plaintiff's neck. (Tr. 413, 414). At follow-up appointments in 2012, even though Plaintiff reported severe pain, Dr. Salama observed moderate tenderness in Plaintiff's lumbar and cervical spine, regular range of motion in her neck, normal muscle strength and range of motion in both hands, and normal Jamar Grasp, Pinch Grip Jaw Chuck, Pinch Grip Key and Pinch Grip Tip in both hands, and no spascity or atrophy in either hand. (Tr. 566, 568-69, 572, 574-75, 578, 609, 616-17).  In late 2011 and early 2012, Dr. Salama reported Plaintiff tested positive for marijuana twice. (Tr. 590, 591).

In November 2011, Plaintiff presented at Parma Community Hospital with left foot pain caused by a wooden bench falling on her, she was diagnosed with mid-second metacarpal fracture. (Tr. 496). She was discharged with crutches and a walking boot. (Tr. 496-97). At follow-up appointments, Plaintiff reported walking in her boot to clean the house, walk her dog, and babysit her grandson. (Tr. 598, 599).

On May 25, 2012, Plaintiff went to Dr. Scott Schnell for a second opinion regarding her hand pain, he observed full flexion/extension in all fingers and thumbs. (Tr. 605). She did have a positive Tinel test and swelling and tenderness in her left wrist, he prescribed a cortisone shot. (Tr. 606). She returned in June complaining of the same symptoms, he discussed with her the possibility of surgery but she declined. (Tr. 606). In August 2012, Plaintiff saw Dr. Schnell

regarding left knee pain, on examination there was minimal swelling but no evidence of deformity and minimal discomfort. (Tr. 613). Dr. Scott provided Plaintiff with a prescription for physical therapy. (Tr. 613).

*Opinion Evidence*

Dr. Salama opined Plaintiff's left arm would only be capable of lifting fifteen pounds and would be able to reach, twist, finger, grasp objects only 30% of the workday. (Tr. 443). Further, for the right arm, Dr. Salama opined Plaintiff could not lift, reach, twist, finger, or grasp at all. (Tr. 443). Two months later, Dr. Salama refused to address any work-related limitations without a functional capacity exam. (Tr. 492-95).

In November 2011, Dr. Gorjanc opined Plaintiff's physical symptoms were exacerbated by her depression and anxiety. (Tr. 446-47). She also concluded Plaintiff could sit for two hours and stand for one hour without a break, could not lift with her right hand but occasionally could lift ten to twenty pounds with her left arm, had no ability to reach, twist, finger or grasp with her right hand, and could only finger 25% of the time with her left hand. (Tr. 447-48, 489). She did not opine on Plaintiff's ability to be on task but did say she was "incapable of even low stress work". (Tr. 449).

Dr. Gorjanc also completed a mental impairment questionnaire where she identified a host of psychological symptoms such as anhedonia, anxiety, lost appetite, decreased energy, brain dysfunction, irrational fears, and isolation. (Tr. 480-81). She noted Plaintiff would have no ability to function in any of the 25 categories listed however she gave no support for these restrictions except that Plaintiff had post-operative wrist pain. (Tr. 482-83). She also opined Plaintiff had extreme limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace, again with no supporting explanation. (Tr. 484).

*State Agency Examiners*

In September 2011, Melissa Bergsten, Ph.D., concluded Plaintiff had mild restrictions in activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, and pace. (Tr. 70, 73-74). Dr. Bergsten opined Plaintiff's depression and stress limited her to simple tasks in a relatively static environment. (Tr. 73-74). At the same time, Jerry McCloud M.D., opined she could occasionally lift or carry up twenty pounds and frequently lift or carry ten pounds. (Tr. 72). He further stated she would be capable of standing or sitting without break for six hours of an eight hour workday. (Tr. 72). She had no manipulative, visual, communicative, environmental, or postural limitations except that she could never climb ladders, ropes, or scaffolds. (Tr. 72-73).

On reconsideration, Caroline Lewin, Ph.D., agreed with Dr. Bergsten's conclusions. (Tr. 86, 90). The physical examination by Gerald Klyop, M.D., concluded Plaintiff could frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, and frequently perform gross and fine manipulation bilaterally. (Tr. 88).

*Consultative Examinations*

Matthew Paris, Psy.D.

On June 22, 2011, Plaintiff saw consultative examiner Dr. Paris, where she reported depression and anxiety resulting from her arthritis and her inability to perform simple tasks. (Tr. 351). She stated she was abused by her ex-husband but her children from that marriage were very supportive of her. (Tr. 352). Plaintiff denied any problems with attention, concentration, or learning disabilities, despite a history of learning disabilities in her family. (Tr. 352-53). Plaintiff stated while she had a history of depression, it was not severe enough to impair her ability to work. (Tr. 354). She complained of constant crying, lack of motivation, decreased energy, lost

appetite, sleep disturbances, and fatigue. (Tr. 354). Although, she reported a history of psychological symptoms she had never sought treatment nor had she ever missed work because of her emotional problems. (Tr. 354-55). While painful, Plaintiff stated she could manage money, drive herself to the doctor, clean, do laundry, cook, and dress herself. (Tr. 355). She believed her depression was more bothersome than the anxiety because although that had increased, she could still get through the day. (Tr. 355-56).

Dr. Paris reported numerous post-traumatic stress symptoms related to her abusive relationship such as nightmares, flashbacks, emotional numbing, and sleep disturbances. (Tr. 354). But otherwise her mental status exam was normal; Dr. Paris had no concerns as to her hygiene or grooming, she had normal eye contact, expressive and receptive language, coherent and goal-directed thought processes, and no hallucinations or delusions. (Tr. 355). She was also oriented to time, date, place, showed no distraction, could recall five digits forward and three backwards, answered all questions related to attention and concentration correctly, and had fair insight and judgment. (Tr. 356). Although she had a depressed affect and was tearful she was able to appropriately answer questions. (Tr. 356). He assigned her a Global Assessment of Functioning ("GAF") score of 55.[1] (Tr. 356). He diagnosed her with post-traumatic stress disorder and major depressive disorder. (Tr. 357).

As to her work-related mental abilities, Dr. Paris concluded she did not have significant difficulties in understanding, remembering, or carrying out instructions but the current state of her depression could limit her ability to concentrate. (Tr. 358). He opined once her symptoms

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (DSM-IV-TR). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.* at 34.

were controlled, she could return to work as she had no difficulties working in the past. (Tr. 358). He also concluded she would probably have difficulty responding to work pressures. (Tr. 359).

Dr. Khalid Darr

On August 25, 2011, Plaintiff was examined by Dr. Darr, complaining of severe right thumb pain and lower back pain. (Tr. 391). On physical examination, Dr. Darr found Plaintiff ambulated normally without an assistive device, was stable at station, comfortable at supine and sitting positions, and had normal intellectual and memory function. (Tr. 392). She had no tenderness, redness, warmth, or swelling in her hands but severely limited range of motion in her right thumb. (Tr. 393). There was no atrophy, she could make a fist bilaterally, no Heberon or Bouchard's nodes, normal grip strength bilaterally, and she was able to "write and pickup coins with either hand without difficulty." (Tr. 393). Further, her lower extremities, cervical spine, dorsolumbar spine, and straight leg raise tests were all normal. (Tr. 393).

Dr. Darr opined Plaintiff had severe degenerative arthritis of the right thumb which caused pain in reaching, handling, and fine and gross manipulation. (Tr. 394). He concluded Plaintiff would have moderate to severe limitations in carrying and lifting objects due to the ongoing thumb pain. (Tr. 394).

*VE Testimony and ALJ Decision*

The ALJ hypothesized an individual or like age, education, and work history who could carry ten pounds frequently and twenty pounds occasionally, could frequently climb ramps and stairs but only occasionally ladders, ropes, and scaffolds, no limits in the hands or arms, and could understand, remember, and carry out instructions, interact with the public, coworkers, and supervisors, maintain concentration, persistence, and pace, and can adjust to normal work

changes. (Tr. 53-54). The VE stated a person with these restrictions could perform work as a receptionist and order clerk. (Tr. 54).

The Plaintiff's attorney added the additional limitation that the individual would not respond well to pressures in the workforce and needed a low stress position with only occasional decision-making. (Tr. 55). The VE was unable to say whether these additional restrictions would allow the individual to perform the past work. (Tr. 55-56). The attorney also added the individual would be off task fifteen percent of the time, the VE responded that recent studies have shown office workers are off task between fifteen and twenty percent of the day but it is not necessarily tied to an impairment. (Tr. 56-61). The attorney then restricted the individual to no use of the right hand to which the VE stated it is possible to work if the individual switched her dominant hand. (Tr. 61-62). The VE stated work would be precluded if the individual had no ability to grasp or turn objects bilaterally and only 25% capacity to finger in one hand. (Tr. 62). Further, the VE stated a sit/stand option would not preclude the past work but could have an impact depending on how long the individual needed to be standing. (Tr. 62-63). The VE testified Plaintiff had transferable skills in basic computing, office procedures, communication, filing, and general office work. (Tr. 63).

In November 2012, the ALJ found Plaintiff had the severe impairments of regional sympathy dystrophy of the hands, cervical and lumbar spondylosis, major depressive disorder, and post-traumatic stress disorder; but these severe impairments did not meet or medically equal any listed impairment. (Tr. 16-17). The ALJ then found Plaintiff had the RFC to perform light work with no postural or manipulative limitations, could understand, remember, and carry out

instructions consistent with performing work from SVP1-SVP4[2], could maintain concentration, persistence, and pace over an eight hour workday and a 40 hour work week from SVP1-SVP4, can interact with general public, coworkers, and supervisors without limitation, and can adjust to normal work changes consistent with SVP1-SVP4 type work requirements, but can only frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds. (Tr. 18).

Based on the VE testimony, the ALJ found Plaintiff could perform her past relevant work as an Order Clerk. (Tr. 22).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court

---

2. Specific Vocational Preparation ("SVP") is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. There are nine SVP levels. The range contemplated here by the ALJ would include short demonstrations only (SVP1) through six months of training (SVP4). UNITED STATES DEPARTMENT OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, APPENDIX C (4th Ed., Rev. 1991), *available at* www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM

cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ erred because (1) the RFC determination was not supported by the evidence and particularly did not include manipulative limitations; (2) the ALJ failed to give controlling weight to the opinions of the treating physicians; (3) the RFC was not a function-by-function analysis; (4) the VE testimony was flawed because the hypothetical was not based on substantial evidence; and (5) the credibility determination was not based on substantial evidence. (Doc. 11, at 1). First, the Court will discuss the weight of the treating physicians' opinions then move on to an analysis of whether substantial evidence exists to support the credibility determination, RFC, and VE testimony.

***Treating Physician Rule***

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 416.902. An ongoing treatment relationship will exist when "medical evidence establishes that [claimant] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice…" § 404.1502.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be

13

obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Salama*

The ALJ concluded Dr. Salama's opinion was entitled to no weight because it was insupportable and inconsistent with his own findings. (Tr. 20). The ALJ specifically noted multiple instances where his examination findings were relatively normal (Tr. 20, 402, 405, 408, 409, 566, 568-69, 572, 574-75, 578, 609, 616-17) but despite these findings Dr. Salama opined Plaintiff had no use of her right hand, a clearly inconsistent conclusion (Tr. 20, 443). In making this conclusion, Dr. Salama cited swelling, muscle weakness, and muscle atrophy as reasons for

inability to function; however, as noted by the ALJ, these symptoms were not observed by Dr. Salama in the majority of his appointments. (Tr. 402, 405, 408, 409, 443, 566, 568-69, 572, 574-75, 578, 609, 616-17). Interestingly, about two months after the October 2011 opinion Dr. Salama refused to opine on Plaintiff's functional capacity to work at all. (Tr. 492-95). Further, the only contradictory evidence cited by Plaintiff to support her argument was Plaintiff's initial treatment session with Dr. Salama, where it is true he observed decreased range of motion and tenderness, (Tr. 409; Doc. 11, at 16), yet this argument ignores his numerous observations following treatment which showed normal findings. (Tr. 402, 405, 408, 409, 566, 568-69, 572, 574-75, 578, 609, 616-17). Here, the ALJ did not err in finding Dr. Salama's opinion unsupported and inconsistent, and thus, provided good reasons for discounting his opinion.

*Dr. Gorjanc*

The ALJ afforded little weight to Dr. Gorjanc's opinions because they were insupportable and inconsistent based on her own findings and those in the record. (Tr. 21). The ALJ concluded Dr. Gorjanc's treatment notes did not support her limitations, she specifically noted findings of normal gait, full strength excluding the right wrist, and no acute distress. (Tr. 21, 524). Further, a review of Dr. Gorjanc's records show no objective findings to support her restrictions, rather Plaintiff's subjective complaints dominate her treatment records. (Tr. 521, 522, 524, 528, 533). Particularly lacking is any support for Dr. Gorjanc's extreme mental limitations; in her opinion she checked Plaintiff was incapable of all functional activities without any supporting documentation or evidence despite other evidence from both Plaintiff and Dr. Paris to the contrary. (Tr. 179-80, 352-58, 480-84). The ALJ also discussed the relatively normal findings of Drs. Salama and Schnell, who found no restrictions in Plaintiff's right hand range of motion, as inconsistent with Dr. Gorjanc's restrictions. (Tr. 20-22, 568-69, 605-06).

A treating physician's opinion is not entitled to controlling weight when it lacks an objective basis. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). In this case, it is clear that Dr. Gorjanc did not have objective evidence to support her physical or mental restrictions and thus, the ALJ gave good reasons for assigning it little weight. § 404.1527(c)(3). *See also White v. Comm'r of Soc. Sec.,* 572 F.3d 272, 286 (6th Cir. 2009) (conclusory statements from physicians, without support from specific documents, are a valid reason for discounting an opinion). Even if Plaintiff's interpretation of the evidence was accurate, substantial evidence exists to support the conclusions made by the ALJ, and thus the Court will not overturn it. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

***Credibility***

Plaintiff argues the ALJ's finding on credibility was based on several erroneous facts, mainly her inability to attend or participate in occupational therapy, her ability to walk her dog for extended periods, her ability to pick up items, and her alleged narcotic dependence. (Doc. 11, at 22-23). When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992).  Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

(i) [A claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;

(vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 416.929(c)(3).

Ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (ALJ's credibility determination accorded "great weight"). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476. The Court may not "try the case de novo, nor resolve conflicts in evidence . . . " *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Here, the ALJ noted multiple inconsistencies between Plaintiff's complaints and the evidence of both daily living and medical record. First, the ALJ noted Plaintiff had received no treatment for her depression aside from Cymbalta and further cited that her medical records are silent as to mental status evaluations. (*See* Tr. 22, 521, 522, 524, 528, 533). Next, the ALJ

concluded Plaintiff's back and neck complaints were out of proportion with her limited attempts at treatment, such as refusing physical therapy, and with her walking her dog daily. (Tr. 22, 522, 605-06). The ALJ also noted Plaintiff had quit her job, despite claiming she was fired, and did not complete occupational therapy for her wrist. (Tr. 22, 427, 430, 516). Lastly, while perhaps of minimal importance, the ALJ did not err in citing to Dr. Salama's concerns about her medication or by recounting the true fact that Plaintiff had tested positive twice for marijuana. (Tr. 573, 573, 576, 590, 591). It is certainly true that Plaintiff can construe these facts in a different light or provide explanation for their occurrence; however that does not alter the reasonableness of the ALJ's conclusions that her activities of daily living and her treatment efforts do not support her credibility. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). From a review of the opinion and the record, the ALJ had substantial evidence to support her conclusion that Plaintiff was not credible.

### *RFC*

Plaintiff also argues the RFC was not supported by substantial evidence particularly because it lacks any manipulative limitations even though the ALJ found regional sympathy dystrophy of the hands was a severe impairment. (Doc. 11, at 11).

A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. § 416.929. An ALJ must also consider and weigh medical opinions. § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1.

18

Here, the ALJ considered Plaintiff's impairments, of main concern to Plaintiff, her hand pain, but found that the objective medical evidence did not support any restrictions. (Tr. 18-22). Her decision is supported by substantial evidence.

The Plaintiff alleges the ALJ only credited the medical findings that supported her conclusion and not those that supported limitations, however this is not true. The ALJ discussed the medical evidence in its entirety but concluded that there were not significant abnormal findings to support restrictions. (*See* Tr. 19, 409). On the other hand, it was well-documented that Plaintiff's physical examinations were often normal and her condition improving. (*See* Tr. 325, 363, 374, 391-98, 402, 405, 429, 524, 528, 569, 572, 575, 578, 605-06, 616). Neither Dr. Salama, her treating physician, nor Drs. Schnell or Darr observed symptoms of decreased functional capacity despite Plaintiff's subjective complaints of pain. (Tr. 393, 402, 492-95, 575, 605-06). The record clearly shows that following surgery, therapy, and pain management treatment her hand was at most suffering only "minimal degenerative changes". (Tr. 605-06).

While the ALJ acknowledged Plaintiff's diagnosis of regional sympathy dystrophy of the hands, it is not a diagnosis that creates disability but rather "the functional limitations imposed by a condition". *Hill v. Comm'r of Soc. Sec.,* 560 F. App'x 547, 551 (6th Cir. 2014). In this case, Plaintiff's complaints and the medical evidence, particularly the surgery, establish the diagnosis but medical records following surgical intervention do not support any functional limitations. Furthermore, any alleged ambiguities in the record are resolved by the ALJ's determination on Plaintiff's credibility, since the evidence supporting limitations was mainly subjective, the ALJ did not err by relying on medical observations in the record which were contrary to Plaintiff's complaints.

For the above reasons, the ALJ did not err in her treatment of Plaintiff's alleged

manipulative restrictions and the RFC determination was supported by substantial evidence.

*Function-by-Function Analysis*

Plaintiff's alleges the ALJ erred because "the RFC must not be expressed initially in terms of exertional categories". (Doc. 11, at 19). The basis of this argument is SSR 96-8p which states at Step Four of the sequential evaluation the RFC must not be expressed in terms of the exertional categories of "sedentary, light, medium, heavy, or very heavy". 1996 WL 374184, *1-3. Here, the Plaintiff conflates exertional categories with exertional limitations, such as lifting, carrying, and manipulation, which she argues the ALJ did not provide for in her opinion. (Doc. 11, at 19). However, the ALJ did provide a function-by-function analysis; essentially she concluded the evidence did not support postural, manipulative, or mental limitations. (Tr. 18). These initial determinations, i.e. that Plaintiff had no restrictions, allowed the ALJ to determine Plaintiff was capable of past work, consistent with the requirements of SSR 96-8p. The Plaintiff's belief that the ALJ misinterpreted the medical evidence does not create error when the ALJ's conclusion was a reasonable interpretation of available medical evidence.

**VE Testimony**

Plaintiff alleges the ALJ did not accurately convey her limitations in the hypothetical given to the VE because she based the hypothetical on selective information. (Doc. 11, at 19). In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence for the conclusion a claimant can perform other work, the hypothetical must accurately portray a claimant's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Here, the ALJ formed a hypothetical that accounted for the physical symptoms and impairments the ALJ believed credible. (Tr. 53-54). Similarly, the lack of mental limitations was based on the lack of objective evidence and Plaintiff's activities of daily living. (*See* Tr. 53-54, 86, 90, 352-56, 358). Plaintiff alleges the hypothetical did not accurately portray her manipulative limitations, (Doc. 11, at 20-21), however, the ALJ concluded that Plaintiff's complaints of manipulative restrictions were mainly subjective and unsupported by the objective medical findings, thus it was not error to exclude them from the hypothetical (*See* Tr. 17-22, 363, 373-74, 402, 405, 408, 409, 427, 566, 568-69, 572, 574-75, 578, 605-06, 609, 616-17). The Court has already found the ALJ did not err in the weight given to the medical opinions and thus, the ALJ's choice not to rely upon them in making her RFC was not in error. Because the hypothetical was based on evidence in the record and the limitations the ALJ found credible, the VE's testimony is substantial evidence upon which the ALJ can rely.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB is supported by substantial evidence, and therefore the Commissioner's decision is affirmed.


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).